IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100068587036580 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 21-mj-278-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer Sean Wilton of the Drug Enforcement Administration, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am a Task Force Officer with the Drug Enforcement Administration and have been since January of 2019. Through my training and experience as a detective and as a narcotics crimes investigator, I have seen firsthand how criminal organizations utilize the internet and various internet-based programs to further their criminal activities. In particular, social networking applications are commonly used as a means of communication between criminal parties to discuss, negotiate, photograph, and plan their criminal activities. Records of

these communications can be found in the possession of the host company and can prove to be vital pieces of evidence for the investigating agency.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances) and 841 (Distribution and Possession with Intent to Distribute Controlled Substances) have been committed by Casey Graham, Tomy Marcelo Ortega, and other persons. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5. On June 14, 2021, Drug Enforcement Administration (DEA) personnel established surveillance on an individual known to them as Casey GRAHAM. GRAHAM was known to DEA to be a large scale distributor of Fentanyl in the Lewiston, ME area. GRAHAM was later stopped that evening by the New Hampshire State Police after DEA personnel had followed him into Haverhill, MA. After leaving Haverhill, MA, GRAHAM's vehicle headed back north on interstate 95. Another vehicle appeared to have left the same apartment complex where GRAHAM had been seen and appeared to have followed GRAHAM northbound. That other vehicle was also stopped by New Hampshire State Police and the operator was identified as

Tomy MARCELO ORTEGA. MARCELO ORTEGA was found to be in possession of a large sum of U.S. Currency.

6. At the same time as this stop, GRAHAM's vehicle was seized in New Hampshire, and DEA personnel searched his vehicle under the motor vehicle exception to the warrant requirement. During the search of GRAHAM's vehicle, DEA personnel located approximately 495 grams of fentanyl hidden in the wall of the center console. GRAHAM was arrested on June 17, 2021, and during a post-arrest interview, GRAHAM identified MARCELO ORTEGA, known to him as "Jay", as the individual from whom he had purchased the narcotics while in Haverhill. GRAHAM also advised DEA personnel during that interview, and in a later interview pursuant to a proffer agreement, that his multiple communications with "Jay" (MARCELO ORTEGA) were conducted using Facebook Messenger. In approximately April of 2021, GRAHAM stated he met MARCELO ORTEGA in Lawrence, MA. GRAHAM told DEA personnel that MARCELO ORTEGA had flagged him down on a street in Lawrence, MA and thrown a sample of fentanyl, along with his phone number and the name "Jay", into GRAHAM's vehicle. GRAHAM explained that approximately two weeks later, he conducted his first narcotics transaction with "Jay" (MARCELO ORTEGA). The details of the deal were discussed using Facebook communications. GRAHAM stated that he ordered a half of a kilogram of fentanyl from "Jay" (MARCELO ORTEGA) for a first-time customer discounted cost of five thousand dollars. GRAHAM told DEA personnel that he chose the location for the deal to be the Walmart in Portsmouth, NH. After the first deal was done, GRAHAM stated that he conducted approximately five more narcotics transactions with "Jay" (MARCELO ORTEGA). For all of these subsequent meetings, GRAHAM stated that the communications used to establish the date, time, amount of narcotics, and price were communicated using Facebook Messenger.

GRAHAM did state that in the communications, the established price for his half of a kilogram of fentanyl order was set at $7,500.00. GRAHAM also stated to DEA personnel that it became common after each deal with "Jay" (MARCELO ORTEGA), that "Jay" (MARCELO ORTEGA) would message GRAHAM on Facebook after the deal to make sure GRAHAM made it home safely. After the last narcotics transaction that occurred on June 14, 2021 where GRAHAM's vehicle was seized following a meeting with "Jay" (MARCELO ORTEGA), GRAHAM received a Facebook message from "Jay" (MARCELO ORTEGA). During this communication "Jay" (MARCELO ORTEGA) asked GRAHAM if they had been stopped by police and "Jay" (MARCELO ORTEGA) also told GRAHAM that he had been stopped by police and had his money seized.

7. MARCELO ORTEGA does have a criminal history out of the state of Massachusetts to include convictions for possession of drugs, receiving stolen property, unlicensed operation of a motor vehicle, and negligent operation of a motor vehicle.

8. GRAHAM stated that Facebook Messenger was how he always communicated with "Jay" (MARCELO ORTEGA). A preservation request was sent to Facebook by DEA to retain all data and information pertaining to GRAHAM's Facebook account.

9. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include

the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

11. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

12. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

13. Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In

addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

15. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

16. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

17. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

18. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

19. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

20. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

21. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

22. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

23. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

24. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic

context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

25.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

26.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

27. Based on the foregoing, I request that the Court issue the proposed search warrant.

28. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

29. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

Respectfully submitted,

/s/ Sean Wilton
Sean Wilton
Task Force Officer
Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: Oct 27, 2021

Time: 4:24 PM, Oct 27, 2021

Honorable Andrea K. Johnstone
U.S. Magistrate Judge

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the Facebook user ID 100068587036580 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

I. **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including **for user IDs 100068587036580:** full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities **during the time period of March 1, 2021 to June 30, 2021.**

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **from March 1, 2021 to June 30, 2021**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which

       the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records and contents of communications and messages made or received by the user **from March 1, 2021 to June 30, 2021**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All past and present lists of friends created by the account;

(j) All records of Facebook searches performed by the account **from March 1, 2021 to June 30, 2021.**

(k) The types of service utilized by the user;

(l) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

    (m)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

Facebook is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 846 and 841 involving Casey Graham and/or Tomy Marcelo Ortega, a/k/a Jay, between March 1, 2021, and June 30, 2021, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Any and all communications pertaining to the possession, sale, or trafficking of illegal drugs and locational data.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

   a.   all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

   b.   such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

      1.   the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

      2.   the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____   _____
Date                              Signature